NUMBER 13-09-023-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


GILBERTO TAMAYO VILLARREAL, 
Appellant,


v.



THE STATE OF TEXAS, Appellee.

 
On appeal from the 275th District Court 

of Hidalgo County, Texas.

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Benavides and Vela


Memorandum Opinion by Justice Vela



 A jury convicted appellant, Gilberto Tamayo Villarreal, of capital murder. See Tex.
Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2009). Because the State did not seek the
death penalty, the trial court assessed punishment at life in prison. See id. § 12.31(a)
(Vernon Supp. 2009). By two issues, appellant argues (1) the trial court erred in denying
his request to make an opening statement, and (2) the jury could not have found beyond
a reasonable doubt that his confession was voluntarily made. We affirm.

I. Background


 Twenty-five-year-old Miguel Aguilar worked at a convenience store called "Gas
Depot" in Edinburg, Texas. On April 22, 2007, he arrived at work in the afternoon and was
supposed to close the store at 10:00 p.m. That evening, between 8:00 and 8:30, Lucita
Leal stopped at the Gas Depot to make a purchase. While standing at the counter, she
saw appellant and a male passenger drive up in a dark green Ford pickup. Appellant went
into the store and walked by the counter. Leal testified that appellant "went back toward
the back and then came back up toward the counter with nothing in his hands." She stated
that his "eyes were scanning the store." When she left, appellant remained inside. As she
walked out of the store, appellant's passenger "kept his head down." About 10:15 p.m.,
Kayleigh Garcia went inside the Gas Depot but did not see anyone inside. When Aguilar
did not return home from work, his mother went to the Gas Depot and found him laying on
the floor behind the counter. She went out to the street and yelled for help. Officer James
Ramirez arrived at the scene and saw Aguilar lying on his left side. He had no pulse and
was not breathing. The pathologist who performed Aguilar's autopsy (1) testified he died from
"a gunshot would to the head."


 Officer Jose Garza testified that the Gas Depot's cash register was found on the
floor next to Aguilar's feet. He stated the "cash register receipt" showed that the register
was last opened at 9:58 p.m. on the night of the murder. The Gas Depot's owner told
police that $104.48 was missing from the cash register.

 On the day after the murder, Robert Alvarez, a detective with the Edinburg Police
Department, retrieved video tape (2) from a security camera located at a motel across the
street from the Gas Depot. During the State's case-in-chief, the jury watched the video
tape while Detective Alvarez testified to what the video tape showed. He stated, in relevant
part: "There is a truck there that just drove in. . . . [W]e believe . . . that this truck is the
Defendant's truck that entered into the parking area of the Gas Depot. . . . [I]t does stay
there approximately a minute, . . . but it exits out the back and heads down south. . . ." He
stated that his investigation led to a suspect named J.D. Urbina, who provided him with a
confession, implicating himself and appellant in Aguilar's murder. Afterwards, appellant
was arrested in Georgia, and Detective Alvarez interviewed him twice after his arrest-once
in Cartersville, Georgia, on May 22, 2007, and again in Edinburg, Texas, on May 23, 2007. 
Appellant did not confess during the first interview, but he did confess during the second
interview. During the second interview, he provided Detective Alvarez with a written
confession, (3) stating in relevant part:

 On April the 22nd 2007 I was at the crack house on South Closner with JD
Urbina. I was smoking crack with him. There was a lot of other persons
there. We ran out of crack and JD said he could get some more money. JD
told me he could jack some place for money. It was nighttime and JD told
me to take him to the corner store. When we got there I saw JD pull out the
gun and go inside the store. JD shot the clerk and we went back to the
house. I don't know how much money he got. JD bought some more crack
and we smoked it. I left the house before the police got there. This was an
accident. Nobody was supposed to die. We just needed more money for
crack. . . .


 Appellant did not testify as a witness in his defense.

II. Discussion


A. Opening Statement

 In his first issue, appellant contends that the trial court erred in denying his request
to make an opening statement to the jury before the State presented its evidence to the
jury, despite the State having waived its opening statement. The court of criminal appeals
has determined that criminal defendants do not have the right to make an opening
statement prior to the presentation of the State's case when the State waives its opening
statement. Moore v. State, 868 S.W.2d 787, 790-91 (Tex. Crim. App. 1993). When the
State waives its opening statement, the criminal defendant may make his or her opening
statement at the close of the State's case-in-chief. Id. at 791; Carlock v. State, 99 S.W.3d
288, 291 (Tex. App.-Texarkana 2003, no pet.).

 Appellant argues that the State's reading of the indictment to the jury constitutes the
equivalent of an opening statement. However, "the reading of an indictment does not
constitute an opening statement by the state." Carlock, 99 S.W.3d at 291. Thus, the trial
court did not err in failing to allow appellant to make an opening statement in light of the
State's waiver. Issue one is overruled. 


B. Voluntariness of Confession

 In his second issue, appellant contends that trickery and deception used by the
police to obtain his confession violated the Due Process Clause of the Fourteenth
Amendment to the United States Constitution and, thus, no rational trier of fact could have
found beyond a reasonable doubt that his confession, taking into consideration the totality
of the circumstances, was voluntarily made. (4) The charge instructed (5) the jury with respect
to the issue of voluntariness of the confession, and the jury returned a general verdict of
guilty.

 An accused may claim his statement was not freely and voluntarily made and thus
inadmissible as a violation of the Due Process Clause. Oursbourn v. State, 259 S.W.3d
159, 169, 170 (Tex. Crim. App. 2008). The Due Process Clause incorporates the Fifth
Amendment's Self-Incrimination Clause. Malloy v. Hogan, 378 U.S. 1, 6-11 (1964). "A
confession may be involuntary under the Due Process Clause only when there is police
overreaching." Oursbourn, 259 S.W.3d at 169; see Colorado v. Connelly, 479 U.S. 157,
164 (1986) (holding that if there is no police coercion or overreaching, no due-process
violation exists). "The Due Process Clause is aimed at protecting suspects from police
overreaching, . . . [and] [t]he same is true for Miranda[ (6)] rights and waivers that apply to
custodial-interrogation statements." Id. "'Miranda protects defendants against government
coercion leading them to surrender rights protected by the Fifth Amendment; it goes no
further than that.'" Id. (quoting Connelly, 479 U.S. at 170).

 "Substantive constitutional law prohibits the government from using an involuntary
confession against an accused with the test for voluntariness being whether the confession
is the product 'of an essentially free and unconstrained choice by its maker.'" State v.
Terrazas, 4 S.W.3d 720, 723 (Tex. Crim. App. 1999) (quoting Schneckloth v. Bustamonte,
412 U.S. 218, 225 (1973)); Alvarado v. State, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995)
(stating that accused's statement is involuntary "only if there was official, coercive conduct
of such a nature that any statement obtained thereby was unlikely to have been the
product of an essentially free and unconstrained choice by its maker"). The "inquiry . . .
examines 'whether a defendant's will was overborne' by the circumstances surrounding the
giving of the confession." Dickerson v. United States, 530 U.S. 428, 434 (2000) (quoting
Schneckloth, 412 U.S. at 226). "The due process test takes into consideration 'the totality
of all the surrounding circumstances--both the characteristics of the accused and the
details of the interrogation.'" Id. (quoting Schneckloth, 412 U.S. at 226). "The
determination 'depend[s] upon a weighing of the circumstances of pressure against the
power of resistance of the person confessing.'" Id. (quoting Stein v. New York, 346 U.S.
156, 185 (1953)).

 In Oursbourn, the court of criminal appeals noted that, in Colorado v. Connelly, the
United States Supreme Court collected cases in which courts found statements involuntary
under Miranda or the Due Process Clause. Oursbourn, 259 S.W.3d at 170. These cases
involve police overreaching and involve fact scenarios such as: (1) "the suspect was
subjected to a four-hour interrogation while incapacitated and sedated in an intensive-care
unit"; (2) "the suspect, while on medication, was interrogated for over eighteen hours
without food, medication, or sleep"; (3) "the police officers held a gun to the head of the
wounded suspect to extract a confession"; (4) "the police interrogated the subject
intermittently for sixteen days using coercive tactics while he was held incommunicado in
a closed cell without windows and was given limited food"; (5) "the suspect was held for
four days with inadequate food and medical attention until he confessed"; (6) "the suspect
was subjected to five days of repeated questioning during which police employed coercive
tactics"; (7) "the suspect was held incommunicado for three days with little food, and the
confession was obtained when officers informed him that their chief was preparing to admit
a lynch mob into the jail"; and (8) "the suspect was questioned by relays of officers for
thirty-six hours without an opportunity for sleep." Id. at 170-71. Based upon these fact
scenarios, the Oursbourn court stated that "due-process and Miranda claims of
involuntariness generally do not require 'sweeping inquiries into the state of mind of a
criminal defendant who has confessed'" (7)[;] rather, "[t]hey involve an objective assessment
of police behavior." Id. at 171.


 Here, the evidence showed that: (1) Detective Alvarez gave appellant his Miranda
warnings prior to each interview, before each interview started, and appellant stated that
he understood these warnings and that he agreed to waive them; (2) appellant's interview
in Georgia lasted about one hour and six minutes and occurred at the Cartersville, Georgia
airport; (3) his interview in Edinburg lasted about one hour and occurred in Detective
Alvarez's office; (4) appellant never requested an attorney and never requested to
terminate either interview; (5) appellant was not denied access to relatives, food, water, or
use of the restroom; (6) no officer either used or threatened to use physical brutality
against him during either interview; (7) appellant does not claim, and the record does not
show, that he was mentally unstable, physically ill, or intoxicated at the time of either
interview; (8) appellant was thirty-five years old at the time of the interviews; and (10)
appellant was released from prison in 2005.

 Nevertheless, appellant contends that his confession was involuntary because (1)
Detective Alvarez told him that the police had evidence connecting him to the murder that,
in fact, did not exist, and (2) the police threatened to arrest his family members. We
address each argument separately.

 1. Misrepresentations About The Evidence

 Detective Alvarez testified that prior to appellant's Georgia interview, the evidence
linking appellant to the murder was: (1) Urbina's confession, implicating appellant in the
murder; (2) Leal's identification of appellant at the Gas Depot on the evening of the murder;
(3) the video from the motel security camera, showing a pickup outside the Gas Depot at
the time of the murder; and (4) appellant owned a pickup. The police did not have any
physical, scientific, or photographic evidence linking appellant to the murder. During the
Georgia interview on May 22, 2007, Detective Alvarez told appellant the "evidence is
overwhelming" and that: (1) the video tape showed his pickup in front of the Gas Depot
at the time of the murder; (2) the video tape showed a person wearing glasses (8) walking
into the Gas Depot at the time of the murder; (3) that this person appeared to be appellant;
and (4) that DNA on a gun and/or gun case could possibly link him to the murder. 
Detective Alvarez testified this evidence did not exist and that he misrepresented the
evidence to appellant in an attempt to obtain the truth from him. During the Edinburg
interview on May 23, 2007, Detective Alvarez told appellant, "We presented evidence to
you yesterday [referring to the Georgia interview], though we told you what we had or
whatever."

 "Misrepresentations made by the police to a suspect during an interrogation [are]
a relevant factor in assessing whether the suspect's confession was voluntary, but it is
insufficient to render an otherwise voluntary confession inadmissible." Green v. State, 934
S.W.2d 92, 99 (Tex. Crim. App. 1996). We view the misrepresentations in the context of
the totality of the circumstances. Id. "Some types of police deception employed during
custodial interrogation, designed to elicit a confession from the accused, are
constitutionally permissible." Id. The focus is on whether the behavior of the officers "was
such as to overbear the will of the accused and bring about a confession not freely
determined." Id. at 99-100 (citing Rogers v. Richmond, 365 U.S. 534, 544 (1961)).

 "Of the numerous types of police deception, a misrepresentation relating to an
accused's connection to the crime is the least likely to render a confession involuntary." 
Id. at 100. In Oursbourn, the court of criminal appeals noted that even though an officer
lied to the accused about witnesses having identified him in a photo spread, the court
stated, "it is well established that lying about the state of the evidence is not the sort of
'overreaching' that implicates the Due Process Clause, as long as the subterfuge used is
not one likely to produce an untrue statement." Oursbourn, 259 S.W.3d at 182. Recently,
the court of criminal appeals stated that "verbal trickery, deception and outright lies
concerning the existence of evidence are acceptable interrogation strategies, but not the
use of false, incriminating documents." Wilson v. State, No. PD-0307-09, 2010 WL
715253, at *4 (Tex. Crim. App. March 3, 2010) (internal quotation marks omitted).

 Appellant has provided no argument concerning how the misrepresentations about
the existence of evidence were "such as to overbear" his will "and bring about a confession
not freely determined." Green, 934 S.W.2d at 99-100. He does not argue, and the record
does not show, that any officer presented false, incriminating documents to him. The
complained-of misrepresentations relate to his "connection to the crime," and are,
therefore, the least likely to render his confession involuntary. See id. (stating that an
interrogating officer's misrepresentation to accused that there was an eyewitness to the
murder "was not of the type that would undermine the reliability of the confession, and it
was not so coercive that it would overbear [the accused's] will and render his confession
involuntary."); Weaver v. State, 265 S.W.3d 523, 534-35 (Tex. App.-Houston [1st Dist.]
2008, pet. ref'd) (deciding that officers' misrepresentations, during the accused's
interrogation, that "(1) witnesses saw him commit the crime, (2) his fingerprints were found,
and (3) a videotape showed his involvement in the crime," did not make the accused's
statement involuntary). We conclude that Detective Alvarez's misrepresentations did not
overbear appellant's will such that his confession was not the product of an essentially free
and unconstrained choice.

 2. Threats To Arrest Family Members

 Appellant argues that during the Georgia interview, Detective Alvarez and two other
officers who were present at the interview threatened to arrest his mother, mother-in-law,
and his pregnant girlfriend. (9) In Roberts v. State, the court of criminal appeals stated that "[a] threat made by police officers to arrest or punish a close relative or a promise to free
a relative of a prisoner in exchange for a confession may render the prisoner's
subsequently made confession inadmissible in evidence." 545 S.W.2d 157, 161 (Tex.
Crim. App. 1977). "When a prisoner has created conditions which place an innocent
relative under suspicion and the prisoner desires to extricate the relative from this position
by making a confession and the confession is self-motivated, it may deem voluntary and
admissible in evidence." Id. "The ultimate question is whether the accused's will was
overborne." Hunter v. State, 148 S.W.3d 526, 531 (Tex. App.-Houston [14th Dist.] 2004,
pet. ref'd).


 Appellant has provided no argument concerning how the threats to arrest his family
members made by the officers caused his will to be overborne. He maintained his
innocence throughout the first interview in Georgia and did not confess until the second
interview, which occurred the next day in Edinburg, Texas. All of the threats to arrest his
family members were made during the first interview. Thus, appellant has not established
a causal link between his confession and the threats. See Oursbourn, 259 S.W.3d at 170
(stating that "[a]bsent police misconduct causally related to the confession, there is 'simply
no basis for concluding that any state actor has deprived a criminal defendant of due
process of law.'") (quoting Connelly, 479 U.S. at 164). (10) Furthermore, the record does not
show that Detective Alvarez or any other officer obtained the confession as a result of any
promise made to appellant, or that appellant confessed out of concern the police would
arrest his family members if he did not confess.


 We note that appellant had served time in prison and was released in 2005. Prior
experience with the criminal-justice system weighs in favor of finding his confession
voluntary. See Green, 934 S.W.2d at 100. Another consideration supporting the
voluntariness of his confession is that he received the Miranda warnings and waived these
rights prior to each interview. See id. We conclude that the circumstances surrounding
appellant's confession were not so coercive to have overborne his free will. Viewing the
totality of the circumstances, we hold that a rational jury could have found from the
evidence beyond a reasonable doubt that appellant's confession was freely and voluntarily
made without compulsion or persuasion in compliance with the Due Process Clause. Issue
two is overruled.

III. Conclusion


 We affirm the trial court's judgment.


 


 ROSE VELA 

 Justice



Do not publish.

Tex. R. App. P. 47.2(b).


Delivered and filed the

10th day of June, 2010.

1. The State introduced the autopsy report into evidence as State's exhibit 68.
2. The State introduced the relevant portion of this video tape into evidence as State's exhibit 76.
3. With respect to the second interview in Edinburg between appellant and Detective Alvarez, the State
introduced: (1) the recording of this interview into evidence as State's exhibit 71; (2) a transcription of this
interview into evidence as State's exhibit 74; and (3) a copy of appellant's written confession into evidence
as State's exhibit 4.
4. Appellant limited his argument to the Due Process Clause of the Fourteenth Amendment to the
United States Constitution. He does not assert a claim under the Texas Constitution or Texas statutory law. 
Therefore, we do not conduct a separate analysis required to determine whether the police conduct in this
case constituted improper inducements under state law. See Muniz v. State, 851 S.W.2d 238, 251-52 (Tex.
Crim. App. 1993) (requiring state and federal involuntariness claims to be argued on separate grounds with
separate substantive analysis or argument provided for each ground). However, we note that a statement
that is involuntary as a matter of federal constitutional law is also involuntary under article 38.22 of the Texas
Code of Criminal Procedure, which governs the admissibility of confessions. Oursbourn v. State, 259 S.W.3d
159, 169 (Tex. Crim. App. 2008). 
5. The charge included an instruction on the voluntariness of the confession as follows:


 You are instructed unless you believe from the evidence beyond a reasonable doubt
that the alleged confession or statement introduced into evidence was freely and voluntarily
made by the Defendant without compulsion or persuasion, or if you have a reasonable doubt
thereof, you shall not consider such alleged statement or confession for any purpose nor any
evidence obtained as a result thereof.
6. See Miranda v. Arizona, 384 U.S. 436 (1966).
7. Oursbourn, 259 S.W.3d at 171 (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)). 
8. The record showed that appellant wore glasses.
9. After the State rested, the defense called Detective Alvarez as a witness and played the video
recording of the Georgia interview to the jury. Defense counsel stopped and started the recording as
necessary in order to question Detective Alvarez about certain verbal exchanges between appellant and the
officers. Appellant directs our attention to the following excerpts from that interview, where Detective Alvarez
is interrogating appellant:


 Your mom's involved, too. You made phone calls to your home. We went and asked
them. We were conducting and [sic] investigation murder. We went and asked if them if
they heard from you and lied to us.


 * * * * 


 Okay. See your girlfriend, your pregnant wife, your common-law wife, whatever she
is, is facing some serious time.


 * * * *


 She helped you run from us. You knew about the [appellant's] warrant. She knew
about the warrant. . . .


 * * * *


 I know you went to the house and left a number so you could call.


 * * * *


 She lied, claiming not to know anything about where you were and the phone numbers. But
we'll get to her later. In the meantime, your baby's going to be born when your girlfriend is
in prison.


 We will charge her. That's not a choice we will have. Whether we can help her or
not depends on how truthful you're willing to be about this.


 * * * *


 She wants to run from the law with baby, we'll fly and pick her up where ever she
goes.


 * * * *


 We don't want anyway [to] mess with those people man. We don't want anyway [to] mess
with your wife. We don't want to mess with your mom. We want you to be honest and say: 
You know what, this ends with me. This what [sic] happened. It should have never gone that
way. Oh, well, that's how it happened.

 

 Or else we're gonna have to pick up your mom. Take responsibility. Or-- 


 * * * *


 Or else we're gonna have to pick up your mom, your wife with a pregnant baby. . .
.


Later during the Georgia interview, an interrogator asked appellant for his wife's name. Appellant told him his
wife's name and said that he and his wife drove to Georgia in a jeep, which belonged to his mother-in-law. 
Then, the interrogator asked appellant:


 You want the guys back in Edinburg go get warrants for all these people and round them up? 
You want them to hold off? We've already got all their information, photographs, and
address, correct?


 * * * *


 Okay. We just need their addresses to make sure and ID her we get the warrant and
all of this stuff.
10. See also Penaflor v. State, Nos. 14-05-00569, 14-05-00570-CR, 2006 WL 3360550 (Tex.
App.-Houston [14th Dist.[ 2006, pet. ref'd) (mem. op., not designated for publication). In that case, officers
interviewed Penaflor twice after his arrest. Id. at *1. Penaflor did not confess during the first interview, but
he did confess during the second interview. Id. He filed a motion to suppress his confession, which the trial
court denied. Id. at *2. On appeal, he argued that the trial court erred in denying the suppression motion
because his confession was induced by direct or indirect promises in violation of the Fifth Amendment to the
United States Constitution. Id. The court held that the confession was given voluntarily. Id. at *5. In
determining whether a causal link existed between the promises and the confession, the court noted that
Penaflor maintained his innocence throughout the first interview and did not confess until during the second
interview. Id. at *4. All of the alleged promises were made during the first interview; none were made during
the second interview. Id. at **4-5. As a result, the court concluded no causal relationship existed between
the promises and the confession. Id.